**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-16-0000403**
**11-OCT-2019**
**09:38 AM**

NO. CAAP-16-0000403

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
AUKUSITINO ATONIO, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 15-1-0849)


MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Fujise and Hiraoka, JJ.)

## I. Introduction

Defendant-Appellant Aukusitino Atonio (**Atonio**) appeals from the "Judgment of Conviction and Probation Sentence" (**Judgment**) entered by the Circuit Court of the First Circuit (**Circuit Court**)[1] on April 20, 2016. Atonio was charged via an Indictment with two counts of Sexual Assault in the Third Degree, in violation of Hawaii Revised Statutes (**HRS**) § 707-732(1)(c) (2014).[2] At trial, Atonio called his children, C.A. and T, to

---

[1] The Honorable Karen S. S. Ahn presided.

[2] HRS § 707-732(1)(c) provides:

> §707-732 **Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:
>
> . . .
>
> (c) The person knowingly engages in sexual contact with a person who is at least fourteen years old
>
> (continued...)

testify on his behalf, and then testified in his own defense, denying that he committed the offenses charged.  Following closing arguments, a jury convicted Atonio on both counts.

On appeal, Atonio raises three points of error:

1.  The trial court plainly erred when it allowed the prosecutor to use Atonio's presence throughout the trial to attack the credibility of T and C.A's testimonies even when there was no evidence that Atonio used his presence to shape their testimony.

. . . .

2.  The prosecutor's statements during closing argument constituted prosecutorial misconduct that deprived Atonio of his constitutional rights to due process and a fair trial.

. . . .

3.  The trial court committed plain error by failing to instruct the jury that Atonio has a constitutional right to be present throughout his trial and the right to call witnesses favorable to his case and that the jury must not draw any unfavorable inference regarding the credibility of his witnesses solely on the basis that he was present throughout the trial.

We note that Atonio references selected portions of the Plaintiff-Appellee State of Hawai'i's (**the State's**) closing argument.  After the State's initial closing argument, defense counsel requested a mistrial or alternatively asked the Circuit Court to strike the closing argument because the prosecutor had argued that the defense witnesses "colluded their stories" and because the prosecutor had made a reference to Atonio being in the courtroom during the trial.  Thus, it appears the defense did object to the closing arguments challenged on appeal.

The Circuit Court denied Atonio's requests for mistrial or to strike the State's closing argument, noting that the prosecutor had not tied Atonio's presence in court to anything. Further, the circuit court *sua sponte* re-read jury instruction no. 15 to the jury, stating in relevant part: "defendant has a

_____

(...continued)

but less than sixteen years old or causes the minor to have sexual contact with the person; provided that:
(i)     The person is not less than five years older than the minor; and
(ii)    The person is not legally married to the minor[.]

2

constitutional right to be present throughout this trial and while other witnesses testify.  You must not draw any unfavorable inference regarding the credibility of the defendant's testimony on the basis that he was present during trial."

Based on our review of the record, we conclude there was no prosecutorial misconduct and affirm the Judgment against Atonio.

## II.  Background

The following facts are not in dispute: the Complaining Witness (**CW**), who was 14 years old at the time of the incident, played volleyball on a youth team coached by Atonio.  Atonio's daughter, C.A., who was sixteen at the time of the incident, also played on the team.  Atonio's son, T, who was 11 years old at the time of the incident, sometimes came to practice and helped his father by collecting balls and the like.  Atonio, C.A., and T lived together at the time of the incident and the trial.  The Atonios would often give the CW a ride home from practice in Atonio's truck, with C.A. and Atonio usually sitting in the front seats, and T and the CW usually sitting in the back seats.  On May 8, 2015, the team had practice.  C.A. did not come to practice that day, but Atonio, T, and the CW did.  On that day, the CW rode her bike to practice, but the chain broke on the way. After practice, Atonio gave the CW a ride home, putting the CW's bike in the bed of his truck.  Atonio and the CW sat in the front seats of Atonio's truck, and T sat in the back.  The drive from the volleyball court where the team practiced to the CW's house was about five minutes.

The CW testified to the following: on May 8, 2015, while Atonio was putting her bike in his truck bed, he said "[d]o you promise not to tell anyone what we say?" and she agreed.  The CW and Atonio got in the truck before T.  Atonio told the CW to sit in the front seat, and she complied.  At this time, Atonio asked to hold her hand, she said "okay[,]" and he clasped her hand.  Then, T got into the truck, and Atonio let go of the CW's hand.  T sat in the back seat behind the CW.  After some conversation, Atonio touched the CW's hand again, this time without asking.  Next, Atonio moved his hand to the CW's thigh

and started to stroke it, eventually touching the CW's pelvic area.  The CW testified that this made her "[v]ery uncomfortable."  Atonio then moved his hand along the left side of the CW's torso and touched the CW's breast.  The CW did not give Atonio permission to touch her breast.  From the time they left practice until they got to the CW's house, Atonio's hand went from the CW's thigh to her breast about five times.  Once they reached the CW's house, Atonio retrieved the CW's bike from the truck bed and told the CW, "[s]o you promise you won't tell anyone what we say?"  The CW agreed.  Atonio then hugged the CW and cupped her buttocks with his hand.  Upon entering the house, the CW told her father what happened.  The police were called and later that night the CW identified Atonio as the person who touched her.

Honolulu Police Department (**HPD**) Sergeant Jason Dela Cruz (**Sergeant Dela Cruz**), a State witness, testified that during booking procedures, Atonio said, without any prompting, "I'm so sorry.  I never mean for do that."[3]

T testified for the defense as follows: he normally goes to volleyball practices to assist Atonio.  T testified that the CW rides home with his family "a lot[,]" with his father and C.A. in the front and he and the CW in the back seats of the truck.  T testified that, on the date of the incident, he knew it was time to leave practice because Atonio called to him.  At this time, Atonio and the CW were already seated in the front of the truck.  T sat behind the CW.  T testified that on the ride home, he was moving around in the back seat because he was "uncomfortable" and "wanted to talk to [Atonio and the CW]."  T testified that he could see Atonio from the back seat during "most of the ride."  T testified that when they reached the CW's house, both he and Atonio retrieved the CW's bike, as usual.  T testified that Atonio never talked to him about what happened in the car that night.

---

[3]  The Circuit Court inquired as to what Sergeant Dela Cruz was doing or saying just before Atonio made the statement, and Sergeant Dela Cruz testified he did not ask Atonio anything or say anything while he was taking Atonio's fingerprints.

C.A. testified for the defense as follows: the CW had only one friend on the volleyball team, and that the CW did not seem to like volleyball. C.A. also testified that, when the Atonios give the CW a ride home, C.A. and Atonio sit in the front of the truck, with T and the CW in the back, with T usually "moving around" and "[t]alking." C.A. also testified that once the CW said she did not have food at home, so they stopped for food. C.A. testified that she was not at practice on the date of the incident because she had May Day at school.

Atonio testified to the following: on the date of the incident, he insisted that the CW ride home with him, because it was raining. He told the CW to sit in the front seat of his truck because she is older than T and he "wanted to talk to her." On the ride home, Atonio talked to the CW about her attitude during practice and games, told her not to listen to her friend on the team, and during the ride T was "actively participating in the conversation" and leaning forward between the front seats to talk. Atonio told the CW not to talk to anybody about what he said, because it "might cause problems with the team." At the CW's house, Atonio and T took the CW's bike out of the back of the truck. After Atonio put the CW's bike in her garage, the CW waved and went in the house. According to Atonio the CW looked "[n]ormal" at this time. Atonio testified that he did not ask to hold the CW's hand, hold the CW's hand, hug the CW, or touch the CW's breast, thigh, or buttock. Regarding his statement at the police station, Atonio admitted to telling a police officer "I'm sorry. I never mean for do that." He testified that this statement was prompted by "the shame for my -- my wife and my kids" because "[e]verybody in my neighborhood saw me being arrested. And this never happened before, and I don't know what happened."

III. **Standard of Review**

"[Appellate courts] evaluate[ ] claims of improper statements by prosecutors by first determining whether the statements are improper, and then determining whether the misconduct is harmless." State v. Tuua, 125 Hawai'i 10, 14, 250 P.3d 273, 277 (2011) (citation omitted); see also State v.

Schnabel, 127 Hawai'i 432, 452-53, 279 P.3d 1237, 1257-58 (2012). Appellate courts consider the following factors when determining whether a prosecutor's statements are harmless: "(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (quoting State v. Sawyer, 88 Hawai'i 325, 329 n.6, 966 P.2d 637, 641 n.6 (1998) (citation omitted)). If the State's prosecutorial misconduct was not harmless, appellate courts must then determine whether the double jeopardy clause of the Hawaii Constitution bars reprosecution of the defendant. Id. at 416, 984 P.2d at 1242.

## IV. Discussion

Atonio quotes the following excerpts from the State's closing argument as establishing prosecutorial misconduct:

> [THE STATE]: Power and control. Power and control over people you love, like your family, daughters and sons. . . . The defendant exhibited power and control throughout this trial.
> The defendant, you know, has two jobs. He works. He's also a coach. He tells you that he's an average coach. Pretty good. Wins on the court. Today he's in a different court. Today he's playing a different game. It's defensive, his game, similar to volleyball, and he positions players accordingly. And he's done that throughout this trial.
>
> [. . . .]
>
> So what are we talking about?
> We're talking about Aukusitino Atonio, the guy sitting right behind me, the guy who's been sitting in this courtroom throughout this trial.
>
> . . . .
>
> Credibility. Page 8 [of the jury instructions], please. Right in the middle about half way down you see the witness — and these are ways that the Court tells you that you can determine credibility. Court gives you instructions on this. . . . Means and opportunity of acquiring the information.
> What are we talking about here?
>
> . . . .
>
> Opportunity of acquiring information.
> Who do we have? Who do we have to argue against what [the CW] says?
> We only have three people, and that's the defendant himself, that's his son[, T], and his daughter[, C.A.]. They told you that they live together. They come here together. They've been here together the whole time.

. . . .

> [. . . .] They know what they're supposed to say.
> What does [the CW] say?

. . . .

> He positions T.
> Just in the car, but where?
> To the right and then to the left.
> Why is he doing this?
> Because he wants you to believe T. He needs you to
> believe T. Because if you believe T, then you can believe
> that T must have seen something. He must have.

. . . .

> [C.A.,] again, lives with the father, came together,
> left together. And she wasn't even there, but she has a lot
> to say about nothing. About McDonald's. She has a lot to
> say about how [the CW] has no friends.
> Why is [C.A.] even here?
> He's positioning her. He wants you to believe that
> [the CW's] father doesn't care about her, because she's got
> this -- she's from this broken home. She's hungry all the
> time. She's got nothing in the refrigerator. No one comes
> home. We know that's not even true.

[. . . .]

> Because [the CW] told you. . . .

[. . . .]

> [C.A.] says, Oh, she's always home by yourself. He
> told you -- the father [of the CW] -- that he works from
> home. He's always home. [C.A.'s] never been in the home.
> How does [C.A.] know?
> Positioning the children to talk for him, to make up
> his story.
> What's another position we're talking about?
> It's T. He makes sure that you understand that T
> always helps him put the bike in the back. T always helps
> him take out the bike from the back.
> And why is that important for him?
> One, it puts T in the back when he was giving her
> the hug and touching her butt, which is the basis of Count
> II. . . .

Atonio's Opening Brief argues that the "power and control"
statements followed by the statement "[w]e're talking about
Aukusitino Atonio, the guy sitting right behind me, the guy who's
been sitting in this courtroom throughout this entire trial"
caused the jury to consider that the defense witnesses had the
"means and opportunity" of acquiring information and that Atonio
had "positioned" C.A. and T due to Atonio being present
throughout the trial. Atonio summarizes his argument as follows:

> [t]he gist of the prosecutor's argument was that Atonio told
> T and C.A. what they had to say to counter [the CW's]

> testimony. In other words, T and [C.A.] were not credible
> because Atonio heard [the CW's] testimony, and then told T
> and C.A. what they had to say in order to discredit her and
> strengthen his own case.

Atonio's recitation of the closing argument in his opening brief omits pages of the State's closing argument, including pages between some of the quoted language and pages separating the one comment about Atonio "sitting in this courtroom throughout this entire trial" and the statement about "[o]pportunity of acquiring information." The manner in which Atonio quotes only certain portions of the State's closing argument misconstrues the theory posed to the jury by the State. Based on our review of the State's entire closing argument, we agree with the Circuit Court's assessment that the State did not tie Atonio's presence at trial to either C.A. or T's testimonies, and thus there was no prosecutorial misconduct in this regard. Rather, we infer that the State's main argument was that Atonio, C.A., and T lived together and thus had the opportunity to collude in order to present congruent testimony and a stronger defense for Atonio. This argument by the State aligned with "Court's General Instruction No. 9" (**Jury Instruction #9**) given by the agreement of the parties. Jury Instruction #9 provides, in relevant part:

> **3.09  Credibility and Weight of Testimony**
>      It is your exclusive right to determine whether and to
> what extent a witness should be believed and to give weight
> to his or her testimony accordingly. In evaluating the
> weight and credibility of a witness's testimony, you may
> consider . . . the witness's relation, if any, to a party;
> the witness's temper, feeling, or bias, if any has been
> shown; [and] the witness's means and opportunity of
> acquiring information[.]

We also conclude that the prosecutor's use of the word "position[ing]" had two functions, neither being improper: (1) to argue that Atonio organized everyone's physical whereabouts on the day of the incident (*i.e.*, taking advantage of C.A.'s absence, telling the CW to sit in the front seat, and telling T to sit in the back seat), and (2) to argue that Atonio was colluding with C.A. and T as exhibited by their conforming testimony (*i.e.*, T leaning forward from the back seat in the truck during the incident and the CW's alleged problems at home).

8

*Cf.* State v. Walsh, 125 Hawai'i 271, 282, 260 P.3d 350, 361 (2011) ("[A] general generic tailoring argument occurs when a prosecutor states that the defendant was able to sit through the trial and hear the testimony of other witnesses, thereby allowing the defendant the opportunity to shape his or her testimony to fit that of other witnesses, even when there is no evidence that defendant has actually done so.") (citation omitted); see also State v. Mattson, 122 Hawai'i 312, 327, 226 P.3d 482, 497 (2010) (holding that because the prosecutor "referred to specific evidence presented at trial in addition to referring to [the defendant's] presence at trial, it cannot be said that the prosecutor's remarks during closing argument continued a 'generic accusation' that [the defendant] tailored his testimony based solely on his presence at trial.").

As previously noted, the Circuit Court denied Atonio's motion for mistrial and request to strike the State's closing arguments, stating:

> THE COURT: This is a family that lives together. I don't think it's an argument that would surprise anybody. It's not rocket science that the other side is going to argue that with the similarity of parts of the stories that something is afoot. I mean, if you guys were reversed, you would be arguing the very same thing, the same kinds of circumstances. So it's not surprising that that argument is being made. Now, he's never tied it to what happened yesterday. And, you know, the record just kind of speaks for itself. I just think it's a logical argument that the other side is going to make. Whether it's true or not, it's up to the jury to decide.
> So I'm going to deny the motion for mistrial. Your client has gotten a fair trial. And I think that's all you asked for at this point.
> [DEFENSE COUNSEL]: In addition, we would be asking to strike the argument based on the fact of improper argument, that the State alluded to the fact that Mr. Atonio was present for the trial, because it's improper.
> THE COURT: The prosecutor never tied that to anything except that he's been here.

(Emphasis added). Then, in an abundance of caution, the Circuit Court re-read "Courts General Instruction No. 15" to the jury:

> THE COURT: Ladies and gentlemen, I just want to emphasize a -- well, I'm just going to read you a part of the instructions that I have read to you. Please remember the defendant has a constitutional right to be present throughout this trial and while other witnesses testify. You must not draw any unfavorable inference regarding the credibility of the defendant's testimony on the basis that he was present during the trial.

9

Based on the foregoing, we conclude the State's closing argument did not assert that Atonio used his presence at trial to affect the testimony of C.A. and T, such as to influence the jury's evaluation of C.A. and T's credibility. We conclude that the State's closing arguments did not amount to prosecutorial misconduct.

In light of the above, we need not address Atonio's remaining point of error that the Circuit Court should have provided further instruction to the jury.

## V. Conclusion

We affirm the "Judgment of Conviction and Probation Sentence" entered by the Circuit Court of the First Circuit on April 20, 2016.

DATED: Honolulu, Hawai'i, October 11, 2019.

On the briefs:

William H. Jameson, Jr.,
Deputy Public Defender,
Office of the Public Defender,
for Defendant-Appellant.

Loren J. Thomas,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge

10